# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHRISTIAN EMPLOYERS ALLIANCE; TRINITY BIBLE COLLEGE & GRADUATE SCHOOL; TREASURE ISLAND COINS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>SYLVIA M. BURWELL, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; THOMAS E. PEREZ, Secretary of the United States Department of Labor; UNITED STATES DEPARTMENT OF LABOR; JACOB J. LEW, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. _____ |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs CHRISTIAN EMPLOYERS ALLIANCE, a North Dakota nonprofit corporation; TRINITY BIBLE COLLEGE AND GRADUATE SCHOOL, a North Dakota nonprofit corporation; and TREASURE ISLAND COINS, INC., a North Dakota corporation (collectively, "Plaintiffs"), through Lewis Roca Rothgerber Christie LLP, allege:

## I.   NATURE OF THE ACTION

1.      This case is about our country's most cherished freedoms: the freedom to exercise one's religion according to the dictates of conscience and to be free of government establishment or favor of one religion over another.  Conscience is the source of the dignity of humankind.  It is the most distinctive aspect of humanity.  This is why James Madison called it "a fundamental and undeniable truth, that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence."  James Madison, *Memorial and Remonstrance* (*circa* June 20, 1785).  Those words resonate today as they did in 1785, and though circumstances have changed, the promise of religious liberty has not.  For Madison in 1785, the issue was mandatory taxation that forced religious dissidents to support religious doctrines they opposed.  The present controversy is much the same.  Defendants here, federal agencies and their officers, seek to coerce Plaintiffs into supporting a practice—the termination of unborn life through abortion—that they find morally abhorrent and that violates their sincerely held religious beliefs.  Faced with the prospect of ruinous fines if they do not comply with the government's mandate, Plaintiffs ask this Court to enjoin Defendants, and declare and secure to Plaintiffs, their members, and their contracting providers that which the Constitution and laws have long guaranteed: the right to exercise their religion free of government control, to be free of the selective burdens this administration has imposed on their practices, to proclaim their convictions freely, to associate with others, particularly their fellow Christians, in defense of their liberty; and to hold the government to its most fundamental charge, obedience to the rule of law.

2.     Plaintiff the Christian Employers Alliance ("Alliance"), a North Dakota nonprofit corporation, is an Evangelical Christian membership ministry that exists to unite and serve Christian employers who wish to live out their faith in ministry, business, and the workplace. The Alliance works and advocates for religious freedom of Christian employers seeking to conduct their ministries and businesses according to their religious values.

3.     Plaintiffs Trinity Bible College and Graduate School ("Trinity Bible College") and Treasure Island Coins, Inc. ("Treasure Island Coins") are Evangelical Christian employers and members of the Alliance.

4.     Alliance members provide health benefits to their employees through insured group health plans or self-funded plans.

5.     As part of their religious witness and exercise, the Alliance and its members are committed to providing health care benefits to employees consistent with their Christian faith and religious convictions. According to these convictions, employee benefits must not include abortion-inducing drugs and devices or related counseling ("abortifacient services") because these are contrary to Christian values and, thus, to all members' sincerely held religious beliefs.

6.     Defendants have promulgated a series of rules that burden Alliance members' sincerely held religious beliefs. These rules (collectively, the "Mandate") require members to provide, pay for, or otherwise directly or indirectly facilitate access to contraceptives, abortion-inducing drugs or and devices, sterilization, and related counseling ("CASC services") for employees and other beneficiaries of members' health plans.

7.     The Alliance and its members object on religious grounds to that portion of the Mandate that requires them provide, pay for, or directly or indirectly facilitate access to abortifacient services ("abortifacient Mandate"). If, however, members exclude such services from their health

plans consistent with their Christian faith and convictions, they fail to comply with the Mandate and face the prospect of ruinous fines of up to $36,500 per affected beneficiary per year, in addition to other penalties.

8.      Defendants have thus put Alliance members to a damnable choice: comply with the Mandate and abandon their religious beliefs, or defy the Mandate and face crippling fines and other penalties.  Members are forced to choose between following the dictates of their conscience or caving to the diktat of the government.  Compliance means cooperation with evil.  Defiance means devastating fines.

9.      The Mandate also impermissibly coerces Alliance members by requiring their insurers and third party administrators ("TPAs") to provide abortifacient services to employees and other beneficiaries as part of members' health plans.

10.     Federal law prohibits the government from imposing these requirements on the Alliance and its members.  The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b), prohibits the government from substantially burdening a person's exercise of religion unless the government can demonstrate that application of the burden to that person is in furtherance of a compelling governmental interest and is the least restrictive means of achieving it.  The government cannot meet that standard here.  The Mandate likewise violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), and the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment.

11.     All members of the Alliance are similarly situated.  All have the same Christian faith and convictions with respect to abortifacient services and the same religious objections to the abortifacient Mandate.  The Mandate imposes the same burden on all members of the Alliance and

puts all members to the same unlawful choice.  All Alliance members, present and future, are entitled to the same relief.

12.     The Mandate has already taken effect against Alliance members or, for some, will take effect against them on the first day of the first plan year that begins on or after September 14, 2015.

13.     Plaintiffs seek a declaration that the Mandate cannot legally be applied to them or any Alliance member, and they seek an injunction barring enforcement of the Mandate against them, against all members of the Alliance, and against any third parties acting in concert with them for the delivery of health care coverage or services, including their insurers and TPAs.

## II.   JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and laws of the United States.  The Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

15.     Venue lies in this district under 28 U.S.C. § 1391(e)(1).  Plaintiffs Trinity Bible College and Treasure Island Coins reside in this district because their principal places of business are here.

16.     Trinity Bible College has its principal place of business in Ellendale, North Dakota. Ellendale is in Dickey County, part of the Eastern Division of the District of North Dakota.

17.     Treasure Island Coins has its principal place of business in Fargo, North Dakota. Fargo is in Cass County, part of the Eastern Division of the District of North Dakota.

18.     Along with the Alliance, each of these Plaintiffs is incorporated or organized in North Dakota.

5

19.     In addition, a substantial part of the events or omissions giving rise to the claims occurred in this district.  Trinity Bible College, Treasure Island Coins, and other Alliance members residing in North Dakota would be harmed by the application of the Mandate in this district by being forced to pay for, provide, or directly or indirectly facilitate access to abortifacient services in violation of their religious beliefs or by suffering penalties as a result of their activities in this district. Application of the Mandate to them would, therefore, violate their religious beliefs, burden their religious practices, and violate their legal and constitutional rights in this district.

## III.   **PARTIES**

### A.    **Plaintiffs**

#### 1.    **Trinity Bible College**

20.     Trinity Bible College and Graduate School is a North Dakota institution of higher education.  It is affiliated with the Assemblies of God, an Evangelical Christian denomination in the Pentecostal tradition.

21.     The mission of Trinity Bible College is to "trai[n] and educat[e] people with theological reflection and missional passion, in order that people and communities everywhere will hear the good news of Jesus and see His love demonstrated."  The college seeks to have students: (i) "[b]e well-equipped leaders with the academic, social and spiritual skills fitted for the modern world"; (ii) "[m]ake a Christ-centered contribution to the communities in which they live and work"; (iii) "[s]erve Jesus Christ authentically in an increasingly complex and diverse world"; and (iv) "[b]e missional minded."  Trinity Bible Coll., Mission Statement, http://www.trinitybiblecollege.edu/ homepage/mission-statement.

22.     The college is committed to the formation of mature Christian character and spiritual life, the development of loyalty to the doctrines and principles of the Assemblies of God, and the preparation of leaders for Christian service.

6

23.     The college offers undergraduate degrees in Biblical Studies, Children's Ministry, and Pastoral, Youth, and Worship Ministry, as well as in Business Administration, Elementary and Physical Education, and Exercise Science. Every undergraduate degree program includes a core curriculum of classes in Bible and theology.

24.     Trinity Bible College offers a graduate degree in missional leadership, designed to equip students for Christian leadership in a complex cultural context.

25.     Trinity Bible College is accredited by the Association for Biblical Higher Education.

26.     Trinity Bible College has been affiliated with the Assemblies of God since its founding in 1948, when three Assemblies of God pastors established the Lakewood Park Bible School in Devils Lake, North Dakota.  After decades of growth and a few name changes, the college has been located in Ellendale, North Dakota since 1972.

27.     The General Council of the Assemblies of God ("General Council") is the highest governing body within the denomination.  The General Council has established the Alliance for Assemblies of God Higher Education ("AAGHE") and tasked that body with developing educational, spiritual, and theological standards for schools who wish to affiliate with the Assemblies of God.

28.     The AAGHE has developed "Endorsement Criteria" to review, evaluate, and endorse Assemblies of God institutions of higher education.  The endorsement process facilitates the development of institutions that are committed to the mission of the Assemblies of God, to the integration of faith and learning in the Pentecostal tradition, and to academic excellence. The purpose of the Endorsement Criteria is to ensure doctrinal fidelity and institutional conformity in ecclesiastical matters, including the Assemblies of God's standards of morality.

7

29.     Trinity Bible College is endorsed by the AAGHE and is committed to maintaining this status by carefully following the AAGHE's Endorsement Criteria in its educational programs.

30.     The AAGHE's Endorsement Criteria also shape how Trinity Bible College selects its leadership, faculty, administrators, and students.

31.     Trinity Bible College is governed by its Board of Trustees.  Board members include Assemblies of God district superintendents and individuals from the fields of church ministry, the professions, and education.  All board members are affiliated with a Pentecostal church; at least 90% are affiliated with the Assemblies of God.

32.     The AAGHE's Endorsement Criteria require the faculty, administrators, and students of Trinity Bible College to be members of an Assemblies of God church or otherwise espouse a personal belief in the basic tenets of the Christian faith as understood by the Assemblies of God.  Faculty members sign an annual statement affirming that their beliefs and conduct are in accord with the Statement of Fundamental Truths of the Assemblies of God.  Senior administrators, who are credentialed with the Assemblies of God, sign an annual statement affirming the Statement of Fundamental Truths of the Assemblies of God, a personal experience of Holy Spirit baptism, and a willingness to influence others with regard to loyalty to the Assemblies of God church and theology.

33.     Trinity Bible College asks all applicants for on-campus programs to affirm that they are born-again Christians, that they desire to be involved in Christian service, and that they agree with the accepted essentials of the Christian faith as held by the Assemblies of God.  Applicants must also provide a letter of recommendation from a pastor.

34.     Student life at Trinity Bible College is also shaped by its commitment to AAGHE standards.  The college is dedicated to strengthening students' appreciation of and attachment to the

8

Christian church, especially the Pentecostal tradition and the Assemblies of God. Every student is required to be involved in a ministry for at least two semesters, with more expected of students in ministry-related majors.

35. Each week, the college holds at least three chapel services that are mandatory for students. The college also has enforceable church and chapel attendance policies for administrators and faculty.

36. Because Trinity Bible College adheres to the Endorsement Criteria, it is eligible for financial support from the Assemblies of God. The AAGHE develops financial resources for endorsed colleges in cooperation with the Assemblies of God Trust. The AAGHE also develops educational resources and runs conferences to help affiliated schools better serve their mission and their students.

37. Like the Alliance, the Assemblies of God teach that abortion is immoral and sinful. This teaching extends to abortifacient drugs and devices since these are "agents that abort, rather than prevent, pregnancy." Gen. Council of Assemblies of God, Sanctity of Human Life: Abortion and Reproductive Issues at 2 (Aug. 2010), http://ag.org/top/Beliefs/Position_Papers/ pp_downloads/PP_Sanctity_of_Human_Life_Abortion_Reproductive_Issues.pdf.

38. Trinity Bible College adheres to the teachings of the Assemblies of God, as well as the Alliance, in belief and practice.

39. Because Trinity Bible College believes that Christian values commend providing health benefits to employees, it offers health coverage to employees and other plan participants through an insured group health plan.

40. Trinity Bible College's health plan presently covers FDA-approved contraceptives, including abortifacient services to which it is morally opposed.

9

41.     Trinity Bible College was not previously aware that its health plan covered abortifacient services.  Having discovered that fact, Trinity Bible College has taken steps to address it.

42.     As a result of the Mandate and the inclusion in its health plan of abortifacient services, Trinity Bible College has had to weigh two Christian values—that which commends providing family-supportive benefits to employees like health care coverage, and that which disapproves of including abortifacient services among such benefits.

43.     Trinity Bible College welcomed the creation of the Alliance as a solution to its moral dilemma and a means of vindicating its right to offer employee health benefits that are consistent with its Christian faith and convictions.

44.     Trinity Bible College wishes to exclude abortifacient services from its health plan. Absent injunctive relief from this Court, however, it cannot do so.  Trinity Bible College cannot exclude these services without incurring crushing fines and other penalties.

45.     Trinity Bible College seeks to act consistently with its religious beliefs without the substantial burden imposed by the Mandate, and for that reason has joined the Alliance in this lawsuit.

46.     Trinity Bible College is in need of injunctive relief on behalf of itself and its insurer so that it may lawfully exclude abortifacient services from its plan and instruct its insurer accordingly.

### 2.     Treasure Island Coins

47.     Treasure Island Coins is a major dealer in precious metals, rare coins, and related products.  It buys and sells gold, silver, platinum, and palladium, and provides services related to precious metals, including market marking, fulfillment, and storage.  Having done business in North

10

Dakota for 40 years, Treasure Island Coins has a reputation for quality, integrity, and customer service. The company is a full member of the Certified Coin Exchange, a member of the Industry Council for Tangible Assets, and an A+ rated member of the Better Business Bureau.

48.     Treasure Island Coins is not a nonprofit entity and has no publicly traded ownership interests. Treasure Island Coins is a closely held for-profit corporation. The company has two shareholders and three board members, all of whom are Christians.

49.     The Christian faith of Treasure Island Coins' owners infuses every aspect of the company's business.

50.     Because of its Christian values, Treasure Island Coins pays its employees an above-market wage and provides generous employee benefits, including a flexible time-off policy to accommodate employees' personal and family needs.

51.     Treasure Island Coins is open for business Monday through Saturday. The owners believe that Sunday is the Christian Sabbath, so the company is closed on Sunday to allow the owners and employees a day for worship, rest, and time with family.

52.     Treasure Island Coins supports several Christian churches and parachurch ministries through regular charitable giving.

53.     Because Treasure Island Coins believes that Christian values commend providing health benefits to employees, it offers health coverage to employees and other plan participants through an insured group health plan.

54.     The owners of Treasure Island Coins are religiously opposed to the inclusion of abortifacient services in the company's health plan. The board of Treasure Island Coins has adopted a resolution pursuant to its applicable rules of governance establishing that it objects to covering abortifacient services in its health plan on account of the owners' sincerely held religious beliefs.

2010583440_8

Specifically, the board has adopted a resolution establishing that the company is committed to providing health care benefits consistent with Christian Ethical Convictions (defined below) and to supporting the right and freedom of Christian employers to do so. This resolution satisfies 26 C.F.R. § 54.9815-2713A(a)(2)(ii) as well as the Alliance's criteria for membership.

55.     Treasure Island Coins' health plan presently covers FDA-approved contraceptives, including abortifacient services.

56.     Treasure Island Coins was not previously aware that its health plan covered abortifacient services. Having discovered that fact, Treasure Island Coins has taken steps to address it.

57.     As a result of the Mandate and the inclusion in its health plan of abortifacient services, Treasure Island Coins has had to weigh two Christian values—that which commends providing family-supportive benefits to employees like health care coverage, and that which disapproves of including abortifacient services among such benefits.

58.     Treasure Island Coins welcomed the creation of the Alliance as a solution to its moral dilemma and a means of vindicating its right to offer employee health benefits that are consistent with its Christian faith and convictions.

59.     Treasure Island Coins wishes to exclude abortifacient services from its health plan. Absent injunctive relief from this Court, however, it cannot do so. Treasure Island Coins cannot exclude these services without incurring crushing fines and other penalties.

60.     Treasure Island Coins seeks to act consistently with its religious beliefs without the substantial burden imposed by the Mandate, and for that reason has joined the Alliance in this lawsuit.

12

61.     Treasure Island Coins is in need of injunctive relief on behalf of itself and its insurer so that it may lawfully exclude abortifacient services from its plan and instruct its insurer accordingly.

### 3.     Christian Employers Alliance

62.     The Christian Employers Alliance is a North Dakota nonprofit corporation.  Its articles of incorporation state that its purposes are "exclusively religious, charitable, [and] educational." Specifically, the articles state that the Alliance is organized:

- To define and state Christian Ethical Convictions as they relate to religious exercise in the workplace;

- To support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values;

- To work and advocate for religious freedom of Christian and other religious employers seeking to conduct their ministries and businesses according to their religious values;

- To support Christian employers in responding to changes in civil law that threaten their ability to conduct their affairs consistent with their Christian Values; and

- To make charitable donations to Christian ministries qualifying as religious or charitable organizations.

Articles of Incorporation of Christian Employers Alliance, art. II, attached as Exhibit A.

63.     The Alliance's bylaws contain a "Statement of Faith" and a statement of "Christian Ethical Convictions."  *See* First Amended & Restated Bylaws of Christian Employers Alliance, art. I, §§ 1.1, 1.2, attached as Exhibit B.  Under article I, section 1.3 of the bylaws, the Statement of Faith and Christian Ethical Convictions (together with other determinations of faith and values by the Alliance's board of directors) constitute "Christian Values."  *Id.* art. I, § 1.3.  A person who lives his or her life according to Christian Values is considered to be a "Christian."  *Id.*

13

64.     All of the Alliance's directors are Christians.  Three-fourths of its directors are required to be Christian and known by their respective pastors.  *See id.* art. IV, § 4.2.

65.     All of the Alliance's officers are Christian.

66.     The Alliance has a standing Ethics Committee, comprised exclusively of Christians who are  known to their respective pastors.  A majority of Ethics Committee members must have "substantial knowledge of Scripture, medicine, or Christian ethics." *Id.* art. V, § 5.1.1.  All committee members are Christian.  The Alliance's bylaws state:

> Upon request of the board, its chairperson, or the president, the ethics committee shall evaluate medical ethical issues and advise the board of its analysis and recommendation; it shall similarly advise the board regarding all benefits, products, and services provided by the Ministry, its affiliates or subsidiaries, or their respective contractors.  The purpose of the committee's advice is to help the board determine whether certain health care coverage, medical services, practices, or medications conform to Christian Values.  If they do not, the committee shall recommend to the board the necessary corrections to achieve conformity with Christian Values.

*Id.* art. V, § 5.1.2.1.

67.     To be a member of the Alliance, an organization, at a minimum, must be a "Christian employer" as defined in the Alliance's bylaws, *see* Ex. A, art. V, and must "commit, by board resolution or otherwise, to providing health care benefits consistent with Christian Ethical Convictions and to supporting the right and freedom of Christian employers to do so," Ex. B, art. III, § 3.1.

68.     To be a member of the Alliance, a nonprofit organization must satisfy three additional criteria.  It must:

> (i) either subscribe to the [Alliance's] Statement of Faith or adopt [its] own creeds or statements of faith that are in harmony and not in conflict with the [Alliance's] Statement of Faith, as determined by the secretary; (ii) affirm that either its highest executive officer or a majority of its governing body is Christian, and (iii) either have § 501(c)(3) status or be specially approved by the secretary as being non-profit.

Ex. B, art. III, § 3.1.2.

2010583440_8

69. To be a member of the Alliance, a for-profit organization must satisfy two additional criteria. It must affirm that:

> (i) Christians (or trusts or other entities wholly controlled by such Christians) own 51% or more of the Member, and (ii) 51% or more of those persons comprising the Member's governing body, if any, are Christians.

Ex. B, art. III, § 3.1.3.

70. Plaintiffs Trinity Bible College and Treasure Island Coins are Christian employers and meet the Alliance's criteria for membership.

71. The Alliance has standing to represent all of its present and future members.

72. The Mandate harms all of the Alliance's members.

73. The Alliance seeks to protect its members' ability to access morally compliant health coverage for their respective employees or agents.

74. Neither the claims asserted nor the relief requested by the Alliance requires individualized proof.

75. The Alliance can adequately represent its members' interests. All members are similarly situated in that all are compelled by the abortifacient Mandate either to pay for, provide, or directly or indirectly facilitate access to abortifacient services for their employees in violation of their sincerely held Christian beliefs.

76. The Alliance brings this action on behalf of specific members who themselves have suffered concrete harm, and one member who will on September 1, 2016, begin to suffer concrete harm, as a result of Defendants' actions.

2010583440_8

**B.**     **Defendants**

77.     Defendants are appointed officials of the federal government and federal government agencies responsible for promulgating, administering, and enforcing the abortifacient Mandate.

78.     Defendant Sylvia M. Burwell is the Secretary of the United States Department of Health and Human Services.  She is sued only in her official capacity.

79.     Defendant United States Department of Health and Human Services ("HHS") is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the abortifacient Mandate.

80.     Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.  He is sued only in his official capacity.

81.     Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the abortifacient Mandate.

82.     Defendant Jacob J. Lew is the Secretary of the United States Department of the Treasury.  He is sued only in his official capacity.

83.     Defendant United States Department of the Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the abortifacient Mandate.

16

## IV.   FACTUAL ALLEGATIONS: PLAINTIFFS' BELIEFS AND PRACTICES REGARDING ABORTION

84.    While Christians use the term "abortion" to include both surgical abortion and abortion-inducing drugs and devices, Defendants refer to some abortion-inducing drugs and devices as "contraceptives."

85.    The Alliance and its members are Christ-centered organizations, dedicated to integrating their Christian convictions into every aspect of their operations, whether ministry or business.  Their religious beliefs include traditional Christian teachings on the sanctity of life.  The Alliance and its members believe and teach that each human being bears the image and likeness of God, that all human life is sacred and precious from the moment of conception, and that God condemns the intentional destruction of innocent human life.  The Alliance and its members therefore believe and teach that abortion is, except in rare cases, sinful and immoral, and that they cannot, as a matter of religious conscience and conviction, knowingly or intentionally participate in, pay for, facilitate, enable, or otherwise support access to abortion.

86.    All Alliance members adhere, in belief and practice, to the Alliance's Christian Ethical Convictions, which state, among other things:

> 1.2.1. Human life, from the moment of conception, is sacred.   Innocent human life should be honored and protected.

> 1.2.2. Abortion is the directly intended taking of human life or termination of pregnancy at any time from the moment of conception through birth, including the interval between conception and implantation.   Abortion is contrary to Christian Values.

> . . .

> 1.2.6.   An employer cannot—consistent with Christian Values—provide services for, healthcare coverage of, reimbursement for, or access to (a) abortion, (b) abortion-inducing drugs and devices . . . or (h) counseling affirming or encouraging any such acts—unless such an employer has exhausted all alternatives that do not bring about a greater evil, the employer opposes the act, and the employer has taken reasonable steps to avoid giving scandal.

17

. . .

    1.2.8.   Christians are called to exercise their faith in their homes, their schools, their ministries, and their businesses.

*See* Ex. B, art. I.

87.    As Christian institutions, the Alliance and its members believe they must adhere to the above teachings as matters of religious faith and doctrine.  Consequently, they believe that the use or procurement of abortifacients and related counseling is contrary to the Christian faith.  The Alliance and its members further believe, as part of their faith, that they must not provide, pay for, or directly or indirectly facilitate access to such services and, therefore, that they must not include abortifacient services in their group health plans.

88.    The Ethics Committee of the Alliance has adopted a resolution concluding that the use of abortifacient services is contrary to Christian Values, and that compliance with the abortifacient Mandate, including the accommodation, is contrary to Christian Values.  In order to avoid engaging in morally illicit acts, materially cooperating with evil, and creating scandal, Alliance members wish to sponsor health plans that exclude coverage of abortifacient services.

89.    Alliance members have no religious objection to providing coverage for non-abortion-causing contraceptive drugs and devices.

## V.    THE MANDATE: STATUTORY AND REGULATORY BACKGROUND

### A.    The Affordable Care Act

90.    On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010).  Days later, the President signed into law the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010).  These two acts, together, are known as the Affordable Care Act (the "Affordable Care Act" or "Act").

18

91.     The Act imposes a series of mandates.  The "individual mandate" requires an "applicable individual" to purchase a health insurance policy that provides "minimum essential coverage."  *See* 26 U.S.C. § 5000A(a).

92.     All individual health insurance coverage, whether purchased through the federally funded exchange or otherwise, must include preventive care, without cost sharing.  45 C.F.R. § 147.130(a)(1).

93.     The "employer mandate" requires large employers to sponsor "group health plans" for the benefit of their employees or pay a penalty.  *See* 26 U.S.C. §§ 4980H(a)(1), 5000A(f)(2).  A "group health plan" is "a plan (including a self-insured plan) of, or contributed to by, an employer . . . to provide health care (directly or otherwise) to the employees, former employees, . . . or their families."  *Id.* § 5000(b)(1).

94.     The Act also imposes new requirements on group health plans.  As relevant here, the Act requires certain employers' group health plans to cover "preventive care and screenings" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).  In covering these services, the plan may not "impose any cost sharing requirements," such as deductibles or copays, on plan participants.  *See id.*

95.     As discussed below, it is through these guidelines supported by the Health Resources and Services Administration that Defendants are attempting to force Alliance members to provide, pay for, or directly or indirectly facilitate access to abortifacient services in violation of their religious beliefs.

96.     Failure to comply with the above mandates results in fines, penalties, and potential civil lawsuits.

97.     An "applicable individual" that fails to maintain "minimum essential coverage" is subject to monetary penalties that may vary based on the individual's income.  *See* 26 U.S.C. § 5000A(c).

98.     A large employer that fails to sponsor a group health plan for its employees is subject to an excise tax of $2,000 per employee per year after the first 30 employees.  26 U.S.C. § 4980H(a), (c)(1).

99.     Any employer (other than a "religious employer" and an employer providing coverage under a grandfathered plan) that sponsors a group health plan but fails to offer required coverage for women's "preventive care" is subject to an excise tax of $36,500 per affected beneficiary per year.  26 U.S.C. § 4980D(b), (e)(1).

100.     The mandates applicable to group health plans are not generally applicable and are subject to significant qualifications and exceptions.

101.     First, small employers—employers with fewer than 50 full-time employees—are not required to sponsor a group health plan at all.  *See* 26 U.S.C. § 4980H(c)(2)(A).

102.     By the government's own estimates, the small-employer exemption exempts 96 percent of all employers in the United States.  These small employers employ nearly 34 million workers.  *See* The White House, The Affordable Care Act Increases Choice and Saving Money for Small Businesses, at 1, http://www.whitehouse.gov/files/documents/health_reform_for_small_businesses.pdf.

103.     Second, "grandfathered" group health plans are not required to cover certain, otherwise mandated services.  As relevant here, grandfathered plans are not required to cover women's "preventive care" services as described in 42 U.S.C. § 300gg-13(4).  *See* 42 U.S.C. § 18011; 45 C.F.R. § 147.140(c)(1).

2010583440_8

104.    Estimates indicate that 35 percent of employers that sponsor group health plans have at least one grandfathered plan.  *See* Kaiser Family Foundation, *Employer Health Benefits: 2015 Annual Survey*, at 214, http://files.kff.org/attachment/report-2015-employer-health-benefits-survey. In 2015, 25 percent of covered workers in the United States—about 37 million people—were enrolled in a grandfathered health plan.  *Id.* at 58, 214.

### B.    Anti-Abortion Provisions in or Applicable to the Affordable Care Act

105.    The text, context, and history of the Affordable Care Act reflect clear congressional intent that no group health plan be required to cover abortion services.

106.    The Act provides that "[n]otwithstanding any other provision of this title (or any amendment made by this title) . . . nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."  42 U.S.C. § 18023(b)(1)(A)(i).  The Act also provides that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion] services . . . as part of such benefits for the plan year."  *Id.* § 18023(b)(1)(A)(ii).

107.    The Affordable Care Act itself does not contain a restriction on the use of federal funds to pay for abortion services.  This omission nearly defeated the Act's passage when a group of pro-life Democrats in the House of Representatives, led by Rep. Bart Stupak of Michigan, threatened to withhold their votes from the bill.  To secure their votes, President Obama issued an executive order that prohibited the use of federal funds to pay for "abortion services . . . , consistent with a longstanding Federal statutory restriction that is commonly known as the Hyde Amendment."  Exec. Order No. 13,535, Patient Protection and Affordable Care Act's Consistency with Longstanding Restrictions on the Use of Federal Funds for Abortion, 3 C.F.R. 201 (2010).

108.    In addition, the Weldon Amendment—a feature of every appropriations act for HHS since 2005—provides, "None of the funds made available in this Act [making appropriations for the Departments of Labor and HHS] may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011). The term "health care entity" includes "a health insurance plan." *Id.*

109.    The Affordable Care Act and the Weldon Amendment prohibit the government from coercing the consciences of health care providers that respect the sanctity of life. Executive Order 13,535 reflects the federal government's longstanding avoidance of coercing the consciences of taxpayers that oppose abortion and government funding of abortion services.

110.    As explained below, the abortifacient Mandate breaches the federal government's historic protection of conscience with regard to abortion and violates the Affordable Care Act, the Weldon Amendment, and other federal laws.

**C.    Regulatory Background**

       **1.    The Interim Final Rules and the IOM Guidelines**

111.    On July 19, 2010, Defendants published interim final rules ("Interim Final Rules") addressing the requirement that group health plans cover "preventive care" services for women. *See* 75 Fed. Reg. 41,726 (July 19, 2010).

112.    Defendants did not permit notice and public comment prior to issuance of the Interim Final Rules, stating that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and

comment process was completed." 75 Fed. Reg. at 41,730. The Interim Final Rules further stated that "it is essential that participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id.*

113.    Defendants opted to publish interim final regulations, rather than proposed regulations subject to a notice-and-comment period, because "interim final regulations provide the public with an opportunity for comment, but without delaying the effective date of the regulations." 75 Fed. Reg. at 41,730.

114.    Despite the alleged urgent necessity of the Interim Final Rules and the supposed need for immediate "certainty" concerning coverage requirements, the Interim Final Rules did not define "preventive care" services for women. They instead provided that "HHS is developing these guidelines and expects to issue them no later than August 1, 2011." *Id.* at 41,731.

115.    HHS delegated its duty to develop the preventive care guidelines to a nongovernmental health policy organization, the Institute of Medicine ("IOM"). IOM thereafter convened the Committee on Preventive Services for Women ("Committee"), consisting of sixteen members.

116.    At least seven committee members had explicit ties to Planned Parenthood, NARAL Pro-Choice America, and other organizations that advocate for increased access to abortion. Such organizations stand to benefit from guidelines that require group health plans to cover abortifacient services.

117.    In developing its guidelines, the Committee held three "open sessions" and invited a select group of individuals and organizations to make presentations on preventive care. Presenters included representatives of Planned Parenthood Federation of America, The Guttmacher Institute, the National Women's Law Center, the National Women's Health Network, and the American

2010583440_8

Congress of Obstetricians and Gynecologists, all of which are well-known advocates for increased access to abortion.

118.    None of the selected presenters included groups or individuals, religious or otherwise, that opposed government-mandated coverage of abortifacient services.

119.    On July 19, 2011, IOM published its report ("Report") identifying the women's preventive services that should be subject to mandatory coverage.  In Recommendation 5.5 of the Report, IOM recommended mandatory coverage for "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  IOM, *Clinical Preventive Services for Women: Closing the Gaps* (July 2011), at 10, *available for download at* http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Dec. 26, 2013).

120.    As the Report acknowledged, the scope of the Committee's review was extremely limited and focused primarily on clinical efficacy of certain preventive services, not on insurance coverage.  *See* Report at 75-76.  Even within that narrow scope, the Committee "had neither the time and resources nor a charge to conduct its own systematic reviews" of the evidence on efficacy.  *Id.* at 75.

121.    Furthermore, because its review was so limited, the Committee did not consider "a host of other issues" that should be evaluated when considering whether to cover preventive services as part of a health plan.  These issues include "established practice; patient and clinician preferences; availability; ethical, legal, and social issues; and availability of alternatives," as well as cost-effectiveness.  Report at 76.

122.    Because the Committee did not consider these issues, it did not evaluate the impact of its recommendations on sponsors of group health plans that object on religious grounds to

24

providing, paying for, or directly or indirectly facilitating access to abortifacient services. Nor did the Committee evaluate its recommendations in light of RFRA and other federal laws and policies that protect rights of conscience.

123.     One member of the Committee, Dr. Anthony Lo Sasso, dissented from the Committee's recommendations, noting that "the lack of time prevented a serious and systematic review of evidence for preventive services" and that "the process set forth in the law was unrealistic in the time allocated to such an important and time-intensive undertaking." Report at 232. In Dr. Lo Sasso's view, "the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." *Id.*

124.     On August 1, 2011, less than two weeks after IOM published the Report, the Health Resources and Services Administration ("HRSA"), a sub-agency within HHS, issued the Women's Preventive Services Guidelines ("Guidelines"). The Guidelines adopted the Report's recommendations nearly verbatim.

125.     In particular, the Guidelines provided that non-grandfathered group health plans are required to provide coverage, without cost-sharing, for "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited Dec. 26, 2013) ("HRSA Guidelines").

126.     HRSA did not explain how, if at all, the Guidelines accounted for the various factors relevant to insurance coverage decisions that IOM declined to consider. Nor did HRSA consider how the Committee's composition and ideological biases affected its deliberations and ultimate recommendations.

127.    HRSA simply rubber-stamped IOM's recommendations.  Indeed, in issuing the Guidelines, HRSA admitted that the Guidelines were "developed" by IOM and simply "supported" by HRSA.  *See* HRSA Guidelines ("The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine, will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible.").

128.    HHS did not permit public comment on the Report or the Guidelines prior to issuing the Guidelines.  The Guidelines were enacted via publication on the HRSA website, rather than through the Federal Register or the Code of Federal Regulations.

129.    The "contraceptive methods" approved by the FDA include "emergency contraception."  *See* FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm.  "Emergency contraception" is abortifacient and includes any drug or device known or reasonably believed to operate by preventing attachment (implantation) to the womb (uterus).

### 2.    The Amended Interim Final Rules and the "Religious Employer" Exemption

130.    On August 1, 2011, Defendants promulgated regulations amending the Interim Final Rules.  *See* 76 Fed. Reg. 46,621 (Aug. 3, 2011).

131.    Defendants acknowledged the "considerable feedback" they had received concerning mandatory coverage for preventive services, including "several" comments on the religious liberty implications of requiring religious organizations to cover abortifacient and other CASC services as part of their health plans.  76 Fed. Reg. at 46,623.

132.     In response to these comments, Defendants amended the Interim Final Rules "to provide HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623.

133.     "Religious employer" was defined in an exceedingly narrow fashion as an organization meeting the following criteria: "(1) [t]he inculcation of religious values is the purpose of the organization"; "(2) [t]he organization primarily employs persons who share the religious tenets of the organization"; "(3) [t]he organization serves primarily persons who share the religious tenets of the organization"; and "(4) [t]he organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46,626.

134.     Section 6033(a)(3)(A) of the Internal Revenue Code refers to "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii).

135.     So defined, the "religious employer" exemption applied only to a subset of churches, their integrated auxiliaries, and religious orders that satisfied the first three prongs of this test. The exemption did not apply to churches with significant charitable or educational activities, such as a church food pantry or Christian school that either served individuals regardless of their faith or employed people of other faiths. It did not apply to separately incorporated ministries such as faith-based charitable organizations, religious colleges, and religious health care institutions. And it did not apply to for-profit employers that seek to run their businesses consistent with their religious values.

27

136.    The "religious employer" exemption did not apply to the vast majority of organizations with religious objections to mandatory coverage of abortifacient and other CASC services.

137.    As Defendants admitted, the exemption was designed for the limited purpose of "accommodat[ing] . . . the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46,623.

138.    Even so, under the amended Interim Final Rules, Defendants contemplated that the religious employer exemption would apply to "plans established *or maintained* by religious employers." 76 Fed. Reg. at 46,626 (emphasis added). So written, the exemption applied on a plan-by-plan basis and would allow a religious employer, such as a church, to sponsor a plan that excluded abortifacient and other CASC coverage and in which non-exempt employers could permissibly participate. In colloquial terms, this was known as the "Piggyback Option."

139.    Consistent with the amended Interim Final Rules, HRSA exercised its discretion to exempt "religious employers" from the requirement to cover CASC services. HRSA did so via a footnote on its website. *See* HRSA Guidelines n.\*\*.

140.    As they had done before, Defendants promulgated the amended Interim Final Rules without notice or opportunity for public comment, determining that "an additional opportunity for public comment would be impractical and contrary to the public interest." 76 Fed. Reg. at 46,624.

### 3.    The Safe Harbor

141.    After the amended Interim Final Rules were issued, Defendants received "over 200,000 responses" addressed to the religious employer exemption. 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012).

142.    In a press release on January 20, 2012, HHS acknowledged the "important concerns some have raised about religious liberty." HHS, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* https://wayback.archive-it.org/3926/ 20150121155601/http://www.hhs.gov/news/press/2012pres/01/20120120a.html. HHS also acknowledged that contraceptives were widely available from sources other than an employment-related health plan, "at sites such as community health centers, public clinics, and hospitals with income-based support." *Id.*

143.    On February 10, 2012, Defendants "finalize[d], without change," the amended Interim Final Rules and maintained the definition of "religious employer." 77 Fed. Reg. at 8,725.

144.    At the same time, Defendants created a one-year "temporary enforcement safe harbor," a self-imposed moratorium on enforcement of the CASC coverage requirement for "certain non-exempted, non-profit organizations with religious objections to covering contraceptive services." 77 Fed. Reg. at 8,728.

145.    The safe harbor applied to "group health plans sponsored by non-profit organizations that, on and after February 10, 2012, do not provide some or all of the contraceptive coverage otherwise required . . . because of the religious beliefs of the organization." *See* 77 Fed. Reg. 16,501, 16,502-03 (Mar. 21, 2012). The safe harbor would remain in effect for an eligible organization until its first plan year beginning on or after August 1, 2013. *Id.* at 16,503.

146.    In the interim, Defendants promised new rules that would "accommodat[e]" the religious objections of these organizations. 77 Fed. Reg. at 8,727.

147.    The safe harbor did not apply to group health plans sponsored by for-profit employers.

### 4.   The Advance Notice of Proposed Rulemaking

148.    On March 21, 2012, Defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM"), seeking comment on "alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, non-profit religious organizations with religious objections to such coverage." Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16,501, 16,503.

149.    The ANPRM presented "questions and ideas to help shape these discussions" and set forth "two goals" that Defendants sought to achieve. 77 Fed. Reg. at 16,503. The first was "to maintain the provision of contraceptive coverage without cost sharing to individuals who receive coverage through non-exempt, non-profit religious organizations with religious objections to contraceptive coverage in the simplest way possible." *Id.* The second goal was to "protect such religious organizations from having to *contract*, *arrange*, or pay for contraceptive coverage." *Id.* (emphases added).

150.    Defendants thus envisioned an "accommodation," an "arrangement under which contraceptive coverage is provided without cost sharing to participants and beneficiaries covered under a plan *independent of* the objecting religious organization that sponsors the plan." *Id.* (emphasis added).

### 5.   The 2013 Final Rules and the "Accommodation"

151.    After receiving over 200,000 comments in response to the ANPRM, Defendants issued proposed rules ("Proposed Rules") on February 1, 2013. *See* 78 Fed. Reg. 8,456 (Feb. 6, 2013).

152.    Defendants received over 400,000 comments in response to the Proposed Rules. *See* 78 Fed. Reg. 39,870, 39,871 (July 3, 2013).  The comment period closed on April 8, 2013. *See* 78 Fed. Reg. at 8,457.

153.    On June 28, 2013, "[a]fter consideration of the comments," Defendants issued final rules ("2013 Final Rules"). *See* 78 Fed. Reg. at 39,871.  The 2013 Final Rules make two principal changes to the amended Interim Final Rules.

154.    First, the 2013 Final Rules revise the definition of "religious employer" to mean "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended."  45 C.F.R. § 147.131(a).  Although Defendants have clarified that an organization does not fail to qualify for the exemption simply because its "purposes extend beyond the inculcation of religious values or because [it] hires or serves people of different religious faiths," the exemption is still limited to "houses of worship."  78 Fed. Reg. at 39,874.  Defendants admit that the revised definition does "not materially expand the universe of religious employers." *Id.*

155.    Second, the 2013 Final Rules purport to "accommodate" so-called "eligible organizations."  An organization is eligible for the "accommodation" if it meets four criteria: "(1) [t]he organization opposes providing coverage for some or all of any contraceptive services required to be covered . . . on account of religious objections"; "(2) [t]he organization is organized and operates as a nonprofit entity"; "(3) [t]he organization holds itself out as a religious organization"; and "(4) [t]he organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the [above] criteria."  26 C.F.R. § 54.9815-2713A(a).

156.    An eligible organization seeking the "accommodation" must execute the self-certification "prior to the beginning of the first plan year to which an accommodation is to apply"

31

and provide a copy of the self-certification to its insurance provider (if it maintains an insured group health plan) or its third party administrator (if it maintains a self-insured plan).  78 Fed. Reg. at 39,875.  A copy of the self-certification form, EBSA Form 700, is attached as Exhibit C.

157.    Upon receipt of Form 700 from an employer who objects to covering abortifacient services, an insurer under a group health plan must "[e]xpressly exclude [abortifacient] coverage from the group health coverage provided in connection with the group health plan" and must "[p]rovide separate payments for any [abortifacient] services . . . for plan participants and beneficiaries for so long as they remain enrolled in the plan."  26 C.F.R. § 54.9815-2713A(c)(2).

158.    Likewise, a TPA that receives a copy of the self-certification must "provide or arrange separate payments for [abortifacient] services for participants and beneficiaries in the plan without cost sharing."  78 Fed. Reg. at 39,880; 26 C.F.R. § 54.9815-2713A(b)(2).

159.    Then 2013 Final Rules impose additional requirements and limitations for eligible organizations with self-insured health plans.

160.    The organization's Form 700 must include notice that "[t]he eligible organization will not act as the plan administrator or claims administrator with respect to claims for [abortifacient] services, or contribute to the funding of [CASC] services," and that the "[o]bligations of the third party administrator are set forth in 29 CFR [§] 2510.3-16 and 26 CFR [§] 54.9815-2713A," *viz.*, regulatory sections outlining the duties of the TPA with respect to abortifacient coverage.  26 C.F.R. § 54.9815-2713A(b)(1)(ii).

161.    The 2013 Final Rules also state that Form 700 "shall be an instrument under which the plan is operated."  29 C.F.R. § 2510.3-16(b).  The form itself says that it is "an instrument under which the plan is operated."  *See* Ex. E.

162.    This phrase, "instrument under which the plan is operated," is critical because it constitutes an amendment of the plan and the appointment of the employer's TPA as plan and claims administrator with regard to abortifacient services.  Only the employer—not the government—can amend an employer's plan and appoint the plan administrator.  That is why the Mandate requires *the employer* to execute Form 700.  *See* 29 U.S.C. 1002(16).

163.    Because the TPA has received such notice, it is obligated to pay the full cost of abortifacient coverage, or arrange for the provision of abortifacient coverage, without cost sharing, to plan participants and beneficiaries.  26 C.F.R. § 54.9815-2713A(b)(2); 29 C.F.R. § 2510.3-16(b).

164.    A purpose of Form 700, therefore, is to require the TPA to deliver abortifacient benefits to the eligible organization's covered employees.  29 C.F.R. § 2510.3-16(b)(1) (duties arising from delivery of Form 700 are exclusively "with respect to coverage of contraceptive services").

165.    The delivery of the form makes the TPA both the plan administrator and the claims administrator for the new abortifacient services plan.  78 Fed. Reg. at 39,879; 29 C.F.R. § 2510.3-16(b) ("[T]he self-certification provided by the eligible organization to a [TPA] . . . shall be treated as a designation of the [TPA] as the plan administrator . . . responsible for [t]he plan's compliance . . . with respect to coverage of contraceptive services[.]").

166.    Delivery of Form 700 is the necessary cause of the insurer's or TPA's duty to provide abortifacient coverage.  Absent such delivery, the insurer or TPA has no such duty, and the eligible organization remains obligated to cover abortifacient services in its health plan.  *See* 26 C.F.R. § 54.9815-2713A(b), (c).

167.    An eligible organization's employees receive abortifacient coverage *only* because they are enrolled in the eligible organization's health plan and the eligible organization has a contractual relationship with its insurer or TPA.  *See* 26 C.F.R. § 54.9815-2713A(b), (c).  Thus, an employee's

33

receipt of abortifacient coverage is directly tied to the employee's enrollment in the eligible organization's group health plan, and the abortifacient coverage ceases when the employee ceases to be enrolled in the plan.

168.     As a result, the 2013 Final Rules still compel religious organizations to *"contract"* or *"arrange"* for abortifacient coverage, despite Defendants' promise in the ANPRM that it would "protect" religious organizations from having to do so.  77 Fed. Reg. at 16,503 (emphases added).

169.     The insurer or TPA must also provide written notice of the availability of abortifacient services to eligible organization's employees at the same time that the TPA delivers other plan enrollment materials.  26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d).

170.     When a self-insured eligible organization signs and delivers Form 700, the form itself, coupled with the regulations it references, becomes an addendum to the eligible organization's plan, and the TPA, previously in possession of the names and contact information for the organization's employees, becomes the plan administrator for the abortifacient services portion of the amended plan.

171.     The 2013 Final Rules make the TPA, for the first time, a fiduciary "under section 3(16) of ERISA."  29 C.F.R. § 2510.3-16(b); 78 Fed. Reg. at 39,879.  Such TPAs, therefore, become subject to criminal penalties, 29 U.S.C. § 501, civil penalties, 29 U.S.C. § 502(l), and civil liability to participants, 29 U.S.C. § 502(a), if they fail to administer, process, and arrangement payment for claims for abortifacient services.

172.     Section 3(16) of ERISA, 29 U.S.C. 1002(16), states that the term "administrator" means "the person specifically so designated by the terms of the instrument under which the plan is operated" or, "if an administrator is not so designated, the plan sponsor."

34

173.    The 2013 Final Rules also imposed a gag order on eligible organizations with self-insured plans by providing, "The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements." 26 C.F.R. § 54.9815-2713A(b)(1)(iii).

174.    Under the 2013 Final Rules, a TPA that receives a copy of an eligible organization's self-certification has *discretion* concerning whether to "enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan." 26 C.F.R. § 54.9815-2713A(b)(2).

175.    The 2013 Final Rules do not limit the grounds on which a TPA may object to providing or arranging separate payments for abortifacient services. A TPA may, therefore, object *on religious grounds* to these responsibilities, and it would have "no obligation . . . to enter into or remain in a contract with the eligible organization." 78 Fed. Reg. at 39,880.

176.    Finally, the 2013 Final Rules eliminated the Piggyback Option and, in so doing, eliminated the last viable moral alternative for ministry employers to avoid the abortifacient Mandate. The 2013 Final Rules declared that the religious employer exemption would be "determined on an employer-by-employer basis," not a plan-by-plan basis, and each eligible organization—even those participating in plans sponsored by exempt religious employers—"must independently satisfy the self-certification standard." 78 Fed. Reg. at 39,886.

177.    Without analysis, Defendants refused to make the accommodation in the 2013 Final Rules available to for-profit organizations, stating only that they were "unaware of any court granting a religious exemption to a for-profit organization." *Id.* at 39,875.

35

D.     **Historic Litigation Challenging the Mandate**

178.     The Mandate engendered historic litigation.  Between 2010 and today, hundreds of religious nonprofit and for-profit organizations have filed over one hundred lawsuits challenging the Mandate and the accommodation.

179.     The initial set of challenges by for-profit organizations reached the Supreme Court in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), where the Court held on June 30, 2014, that the Mandate, "as applied to closely held corporations, violates RFRA." *Id.* at 2785.  The Court found that the Mandate substantially burdened the for-profit businesses' religious exercise and that Defendants had failed to satisfy the least-restrictive-means standard. *Id.* at 2779, 2783.

180.     On July 3, 2014, the Supreme Court issued an order in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), granting the nonprofit plaintiff, Wheaton College, an injunction against the Mandate pending appellate review, without forcing the college to sign and submit Form 700 under the accommodation.  Instead, Wheaton College merely had to inform the Secretary of HHS in writing that it is a religious nonprofit and "has religious objections to providing coverage for contraceptives." 134 S. Ct. at 2807.  The Court did not require Wheaton College to disclose its TPA's contact information.

181.     Two challenges by nonprofit organizations were filed in the U.S. Court of Appeals for the Eighth Circuit.  In *Sharpe Holdings, Inc. v. U.S. Department of Health & Human Services*, 801 F.3d 927, 943, 945 (8th Cir. 2015), and *Dordt College v. Burwell*, 801 F.3d 946, 948 (8th Cir. 2015), the Eighth Circuit held that the Mandate and the accommodation imposed a substantial burden on the plaintiffs' religious beliefs and Defendants had not shown that the accommodation process was the least restrictive means of furthering the government's interest.

182.    The Eighth Circuit was the first federal appeals court to rule in favor of nonprofit organizations challenging the accommodation.  To date, it is the only federal appeals court to recognize how the accommodation actually works.  As described here in detail, and in direct contrast to what Defendants repeatedly misrepresented to federal courts across the country, the accommodation process does not separate the delivery of CASC benefits from an objecting employer's health plan.  As the Eighth Circuit observed, "self-certification under the accommodation process accomplishes what [plaintiffs'] prior instructions had specifically prevented: the provision of objectionable coverage ***through their group health plans*.**"  *Sharpe Holdings*, 801 F.3d at 942 (emphasis added).

E.    **Alternative Notice Process and Extension of Accommodation to Closely Held For-Profits.**

183.    Following the decisions in *Hobby Lobby* and *Wheaton College*, on July 10, 2015, Defendants—seeking to nullify the religious liberty protection provided to closely held for-profit employers by *Hobby Lobby*—issued new final rules ("2015 Final Rules") that (1) extended the morally unacceptable accommodation to qualifying closely held for-profit entities and (2) created an "alternative notice process" for the accommodation.  *See* 80 Fed. Reg. 41,318 (July 14, 2013).

184.    To be an eligible organization and qualify for the accommodation under the 2015 Final Rules, a for-profit entity must meet the following criteria: (i) "[i]s not a nonprofit entity"; (ii) "[h]as no publicly traded ownership interests"; (iii) "[h]as more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto"; and (iv) "[its] highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent

with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owner's sincerely held religious beliefs." 26 C.F.R. § 54.9815-2713A(a)(2)(ii), (a)(4).

185.    Under the alternative notice process in the 2015 Final Rules, an eligible organization may, instead of providing Form 700 to its insurer or TPA, provide notice to the Secretary of HHS "that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services." 26 C.F.R. § 54.9815-2713A(b), (c).

186.    The notice to the Secretary of HHS must contain the following information:

    a.    "the name of the eligible organization and the basis on which it qualifies for an accommodation";

    b.    "its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable)";

    c.    "the plan name and type"; and

    d.    "the name and contact information for any of the plan's third party administrators and health insurance issuers."

*Id.* § 54.9815-2713A(b)(ii)(B), (c)(ii).  The employer must update HHS if any of this information changes.  *Id.*

187.    If the organization sending the alternative notice has an insured plan, HHS "will send a separate notification to each of the plan's health insurance issuers informing the issuer" that HHS has received a notice from the employer and "describing the obligations of the issuer under this section." *Id.* § 54.9815-2713A(b)(ii)(B).

188.    If the organization sending the alternative notice has a self-insured plan, HHS will forward the notice to the Department of Labor, which will then send a separate notification to each of the plan's TPAs informing the TPAs that HHS has received a notice from the employer and "describing the obligations of the [TPA] under 29 CFR 2510.3-16 and this section." *Id.* § 54.9815-2713A(b)(ii)(B).

189.     The 2015 Final Rules state that "[t]he DOL notification will be an instrument under which the plan is operated, and will supersede any earlier designation." 80 Fed. Reg. at 41,323. The 2015 Final Rules also state that, "[i]n establishing and implementing this alternative process, DOL is exercising its broad rulemaking authority under title I of ERISA, which includes the ability to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A)." *Id.*

190.     Under the accommodation (including the alternative notice process), the moment an eligible organization contracts with an insurer, the insurer becomes obligated to provide coverage for abortifacient services as part of its insurance policy. While the accommodation may provide two alternative mechanisms for an employer to satisfy the Mandate, it does not provide any avenue by which an employer's insurer can abstain from providing abortifacient coverage. Thus, for employers who object to such coverage, it is impossible to contract with an insurer without triggering coverage for abortifacient services.

191.     Along with the 2015 Final Rules, Defendants issued a revised EBSA Form 700, which is attached as Exhibit D. The revised Form 700 states that instead of signing and submitting it to the employer's insurer or TPA, an eligible organization may "[a]lternatively" "provide notice to the Secretary of [HHS]." Ex. F, EBSA Form 700 at 1 (rev. Aug. 2014).

192.     The revised Form 700 describes what the alternative notice to the Secretary of HHS must contain and provides a link to a model notice that meets these requirements. *Id.* at 2; *see also* http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Model-Notice-8-22-14.pdf ("Model Notice").

193.     The revised Form 700 informs eligible organizations that "[t]his form or a notice to the Secretary [of HHS] is an instrument under which the plan is operated," *id.* at 2—again drawing on the phrase necessary for an employer to amend its plan.

194.    The 2015 Final Rules withdrew the "gag order" described in paragraph 173. *See* 79 Fed. Reg. 51,092, 51,095 (Aug. 27, 2014) (Interim Final Rules).

195.    The 2015 Final Rules "are applicable beginning on the first day of the first plan year . . . that begins on or after September 14, 2015." 80 Fed. Reg. at 41,318.

**F.    The Supreme Court's *Zubik* Order**

196.    Challenges by some nonprofit organizations reached the Supreme Court, and some of these cases were consolidated under *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

197.    The 2015 Final Rules were issued while these challenges were pending in the lower courts.  In briefing in those cases, Catholic and Evangelical Christian plaintiffs explained why the alternative notice process did not relieve the burden on their religious exercise.  For example, in its brief on the merits to the Supreme Court in *Little Sisters of the Poor v. Burwell* (one of the cases consolidated with *Zubik*), the plaintiffs explained that the alternative notice process "operates just like the original one" because it requires employers to "empower their insurers or plan administrators to use [the employers'] own plan infrastructure to provide the coverage."  Br. for Pet'rs at 24, 2, *Little Sisters of the Poor v. Burwell*, Nos. 15-35, 15-105, 15-119 & 15-191 (Jan. 4, 2016).

198.    In briefing in the lower federal courts, Defendants had inaccurately and misleadingly argued that, under the accommodation, CASC coverage from an insurer or TPA was provided separately from an employer's plan.  *See, e.g.*, Gov't Br. at 25, *Priests for Life v. U.S. Dep't of Health & Human Servs.*, Nos. 13-5368, 13-5371, 14-5021, 772 F.3d 229 (D.C. Cir. 2014) (religious ministries "need not place contraceptive coverage into the basket of goods and services that constitute their healthcare plans" (quotation omitted)).  But in briefing to the Supreme Court in the *Zubik* cases, Defendants corrected their earlier misrepresentations, conceding that under the accommodation, CASC coverage provided by a TPA "is, as an ERISA matter, part of the same ERISA plan as the

2010583440_8

coverage provided by the employer." Gov't Br. in Opp. at 19, *E. Tex. Baptist Univ. v. Burwell*, No. 15-35.

199.    The Supreme Court asked the parties for supplemental briefing in the *Zubik* cases. In their supplemental brief, Defendants conceded that, for employers with insured plans, there was a less restrictive means of achieving the government's objectives.  Defendants admitted that the existing regulatory scheme "could be modified" to eliminate the self-certification requirement for insured employers without affecting the government's purported interest in "seamless" coverage for women.  Under any conception of RFRA, this concession is fatal to Defendants' case.

200.    On May 16, 2016, the Supreme Court issued an order in the *Zubik* cases, vacating the judgments below, remanding the cases, and instructing Defendants to work with the plaintiffs "to arrive at an approach going forward that accommodates . . . religious exercise." *Zubik*, 136 S. Ct. at 1560.  The Court expressly envisioned that the plaintiffs would be able to "contract for a plan that does not include coverage for some or all forms of contraception." *Id.*  The Court "expresse[d] no view on the merits of the cases." *Id.*

201.    On the same day it issued the *Zubik* order, the Supreme Court granted certiorari, vacated the judgments, and remanded in several other nonprofit cases challenging the Mandate and the accommodation, including the Eighth Circuit's decisions in *Dordt College, see* 136 S. Ct. 2006 (May 16, 2016), and *Sharpe Holdings, see* 2016 WL 2842448 (May 16, 2016).

**G.       Defendants' Requests for Information**

202.    Following the *Zubik* order, on July 22, 2016, Defendants issued "Requests for Information" ("Requests"), seeking public feedback on "alternative ways" for eligible organizations "to obtain an accommodation, while still ensuring that women enrolled in the organizations' health plans have access to seamless coverage of the full range of Food and Drug Administration-approved

contraceptives without cost sharing." *See* Requests for Information: Coverage for Contraceptive Services, CMS-9931-NC (July 22, 2016), https://www.regulations.gov/document?D=CMS-2016-0123-0001.

203.    In the Requests, Defendants continue to misrepresent how the accommodation works for self-insured plans. Defendants rightly state, "If an employer has a self-insured plan, the statutory obligation to provide contraceptive coverage falls only on the plan—there is no insurer with a preexisting duty to provide coverage."

204.    But Defendants wrongly state that "the accommodation establishes a mechanism for the *government* to designate the employer's TPA as a 'plan administrator' responsible for separately providing the required coverage under [ERISA]. That designation is made by the government, not the employer" (emphasis added). The government cannot itself designate a TPA as plan administrator because ERISA does not permit it to do so—only the employer, as plan sponsor, has that power. Moreover, the fact that only the employer can designate a plan administrator is precisely why the government insists that nonprofit ministries execute Form 700 or the notice to HHS. Absent such execution *by the employer*, there is no plan administrator for abortifacient services, and the government has no power to facilitate the delivery of these services to plan participants.

205.    Whether an employer's plan is insured or self-insured, the Mandate and the accommodation operate by conscripting the employer's plan as the conduit for the delivery of abortifacient services.

## VI.   THE MANDATE VIOLATES FEDERAL LAW.

206.    The Mandate violates federal law. It substantially burdens the Alliance and its members' religious practices, intentionally discriminates against them, intrudes upon their internal decisions, compels them to convey a morally repugnant message, prohibits them from associating with others in an effort to provide health benefits consistent with their moral values, and creates a

42

religious caste system.  In promulgating the Mandate, Defendants engaged in arbitrary and capricious action, violated express federal law, and improperly delegated their regulatory authority to a nongovernmental and ideologically biased panel of unaccountable decisionmakers.

A.  **The Affordable Care Act Creates a Discriminatory Religious Caste System.**

207.   The Affordable Care Act, its regulations, and Defendants' admissions have created a religious caste system where the quantum of government-permitted religious freedom depends upon where a religious person or religious institution falls within this system.  The Mandate stratifies religious organizations in direct contravention of the First Amendment Establishment Clause.

208.   First, Defendants deem some employers sufficiently religious and have granted them exemption from the Mandate.  45 C.F.R. § 147.131(a).  These employers include churches, conventions of churches, and the exclusively religious activities of religious orders.  26 U.S.C. 6033(a)(3)(A)(i) and (iii).  They also include the ministries of these religious groups—so long as they are not separately incorporated.[1]  Finally, they include "integrated auxiliaries" of these ministries.  45 C.F.R. § 147.131(a).  Whether an auxiliary is deemed "integrated" depends in part on whether it is internally supported.  *See* 26 C.F.R. § 1.6033-2(h)(4).

209.   Second, an eligible organization is not exempt.  In order to qualify for the accommodation, an employer must engage an insurer or TPA to act as a surrogate plan and benefits administrator for the abortifacient portion of its health plan and must cause the insurer or TPA to inform employees of the abortifacient coverage.

210.   Third, a TPA with moral objections to providing or arranging for abortifacient coverage can opt out of its contract just after an eligible organization provides it with Form 700 and

---

[1] *See* 45 C.F.R. § 147.131(a) (separately incorporated ministries other than "churches, their integrated auxiliaries, and conventions or associations of churches" or "exclusively religious activities of religious orders" listed in 26 U.S.C. § 6033(a)(3)(A)(i), (iii) do not qualify for "religious employer" exemption); *see also* 78 Fed. Reg. at 39,886 (exemption determined on employer-by-employer basis).

the TPA thereby learns of its abortifacient coverage obligations. 78 Fed. Reg. at 39,879-80. The government has admitted that a TPA of a church plan may avoid penalties and sanctions whether it opts out of or stays in its contract to serve as a TPA because the government lacks ERISA enforcement authority with respect to TPAs of self-insured church plans. *See, e.g.*, Br. for Resp'ts at 7, *Little Sisters of the Poor v. Burwell*, Nos. 15-105 & 15-119 (Sep. 2015) .

211.    For people of Christian faith who are opposed to abortifacient services, "religious employers" are no more or less religious if they are churches or non-church ministries, if they are for-profit or nonprofit employers, if they are operating divisions of churches or separately incorporated, or if they are internally or externally supported. But the Mandate provides selective quanta of religious freedom depending on the type or classification of each religious entity.

**B.    The Mandate Irrationally Discriminates Against Evangelical Christian Ministries Who Are Independent and Who Raise Their Own Financial Support.**

212.    The Mandate's religious exemption for churches and their "integrated auxiliaries" (as defined under § 6033(a)(3)(A) of the Internal Revenue Code) irrationally discriminates against Evangelical Christian ministries like the Alliance and its members.

213.    Some of the Alliance's nonprofit members have made the decision to incorporate separately from churches as a matter of religious principle, based on a belief that they better serve God by working alongside churches while remaining independent from them.

214.    The terms of the government's exemption essentially punish this choice. To qualify under the government's definition of a "religious employer," parachurch ministries would have to give up their calling to work alongside churches and denominations to promote interfaith cooperation.

215.    Under § 6033(a)(3)(A) of the Internal Revenue Code, Defendant United States Department of the Treasury has defined an "integrated auxiliary" as an entity that is "internally supported," meaning that it receives most of its support from its church rather than its own fundraising.  *Id.* § 1.6033-2(h)(1)(iii), (h)(4)(ii); 26 C.F.R. § 1.6033-2(h)(1)(iii).

216.    Importing this distinction from the tax code into the Mandate is irrational and violates the Establishment Clause.

## C.    The Mandate Substantially Burdens Plaintiffs' Religious Beliefs and Practices.

217.    The decisions of Alliance members to provide health plans for their employees and to exclude abortifacient coverage therefrom qualify as the exercise of religion.

### 1.    The Mandate's Substantial Burden on Members' Religious Exercise

218.    Most members of the Alliance do not qualify as "religious employers" under the 2013 and 2015 Final Rules (together "Final Rules").  They are "eligible organizations," or would be if they executed and delivered either Form 700 or the notice to HHS required by 26 C.F.R. § 54.9815-2713A(a)(3).

219.    The Mandate's regulatory scheme has left no option for Alliance members that does not substantially burden the exercise of their Christian faith.  Their options are: (1) provide a group health plan that includes coverage of abortifacient services, (2) provide a group health plan that excludes coverage of abortifacient services, (3) enter into the accommodation, or (4) cease providing health care coverage.

220.    Option 1, directly providing the abortifacient coverage, is contrary to Christian Values, would constitute material cooperation with evil, and would give rise to scandal.

221.    Absent injunctive relief from this Court, Option 2 is ruinous because it would subject members to fines of up to $100 per affected beneficiary per day, or as much as $36,500 per affected beneficiary annually.  It is also impractical because insurers and TPAs, who operate in a highly regulated industry, are unlikely—absent invalidation of the Mandate—to risk fines, liability, and regulatory scrutiny by excluding coverage of abortifacient services.

222.    Option 3, entering into the accommodation, burdens members' exercise of their Christian faith.

223.    Entering into the accommodation by using Form 700 substantially burdens the religious exercise of self-insured member employers because:

      a.      The Final Rules require each employer to give a notice to its TPA of the TPA's legal obligation to provide abortifacient benefits;

      b.      The Final Rules require the employer to sign a notice that amends the employer's plan to include a second binder of abortifacient benefits;

      c.      The Final Rules require the employer to engage in a statutory scheme that makes its TPA the plan and benefits administrators for the abortifacient benefit portion of its plan;

      d.      The Final Rules require the employer to permit its TPA to utilize its knowledge of the names and contact information of employees for the purpose of making abortifacient services available to them;

      f.      The Final Rules require the employer to give notice to its TPA of the TPA's legal obligations to inform employees that the TPAs will provide abortifacient benefits at no cost to employees, thus giving rise to scandal.

46

224.    The Mandate and the accommodation affect Alliance members with insured plans differently.  When a member employer contracts with an insurer, that insurer is automatically obligated to provide "coverage" for abortifacient services as part of the contracted plan or coverage.  *See* 42 U.S.C. § 300gg-13(a).

225.    At its core, the accommodation requires Alliance members to engage a surrogate to provide benefits that the members' Christian Values prevent them from providing.  The accommodation, therefore, does not alleviate members' religious objections to the abortifacient Mandate.

226.    The Final Rules also create the risk of scandal.  When a member employer, having entered into the accommodation, distributes plan information to its employees in connection with enrollment in coverage, the insurer or TPA must notify employees in writing that the employer does not administer or fund abortifacient benefits, but that the insurer or TPA provides separate payments for abortifacient services.  *See* 26 C.F.R. § 54.9815-2713A(d).  Such notice must be provided at the same time as, though separate from, any materials distributed by the employer.  *Id.*

227.    Employees are unlikely to read the disclaimer provided by the insurer or TPA.  Those who do are unlikely to grasp the distinction the Final Rules purport to draw between the employer and its insurer or TPA.  Employees will simply know that, as a direct result of their enrollment in the employer's plan, they receive abortifacient benefits.

228.    This situation gives rise to scandal and the loss of members' reputation because employees will perceive that their employer professes one thing but does another.  Such scandal devastates ministry.

229.    Defendants' own regulations admit that there is no meaningful separation between the eligible organization and the provision of abortifacient benefits to employees under the

47

accommodation.  Employees still receive abortifacient benefits "*under . . .* the employer's plan," 78

Fed. Reg. at 39,879 (emphasis added).

230.    The predecessor of Defendant Secretary Burwell, Secretary Kathleen Sebelius,

herself admitted the true effect of the accommodation in her remarks at Harvard University on April

8, 2013, the final day for comment on the Proposed Rules.  Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation
> and by August 1st of this year, every employer will be covered by the law with one
> exception.  Churches and church diocese [sic] as employers are exempted from this
> benefit.  But, Catholic hospitals, Catholic universities, other religious entities, *will be*
> *providing coverage* to their employees starting August 1st.
>
> . . .
>
> [W]e are about to promulgate the final rule and as of August 1st, 2013, every
> employee who doesn't work directly for a church or a diocese will be included in the
> benefit package.

*See* Kathleen Sebelius, Remarks at The Forum at Harvard School of Public Health (Apr. 8,

2013), http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius/ (emphasis

added).

231.    From these remarks, it is clear that even Defendants view the accommodation as still

requiring eligible organizations to "provid[e] coverage" of abortifacient benefits to their employees.

Accordingly, the regulations state that the employer participating in the accommodation "is

considered to comply" with the Mandate.  78 Fed. Reg. at 39,879.

232.    Then-Secretary Sebelius's remarks also reveal that Defendants were poised "to

promulgate the final rule" before the comment period closed.  Defendants apparently gave no

consideration to the 400,000 comments received on the Proposed Rules, including comments that

explained that the proposed "accommodation" would not alleviate the objections of many religious

organizations.

233.   Entering into the accommodation via the alternative notice process does not alleviate these burdens.

234.   Before and after the 2015 Final Rules, the accommodation has the same goal: "preserv[ing] participants' and beneficiaries' . . . access" to CASC services.  80 Fed. Reg. at 41,323.

235.   Before and after the 2015 Final Rules, the accommodation works by forcing a self-insured employer to amend its plan and appoint its TPA as the plan administrator for CASC services.  See *id.*; 29 U.S.C. § 1002(16)(A)(i) (a plan administrator is designated "by the terms of the instrument under which the plan is operated").

236.   Before and after the 2015 Final Rules, the government admits that the accommodation has the same effect.  Its own website says, "Regardless of whether the eligible organization self-certifies in accordance with the July 2013 final rules, or provides notice to HHS in accordance with the August 2014 [Interim Final Rules], the obligations of insurers and/or TPAs regarding providing or arranging separate payments for contraceptive services are the same."  Ctr. for Consumer Info. & Insur. Oversight, Fact Sheet, *available at* https://web.archive.org/web/ 20141008210157/http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/womens-preven-02012013.html.

237.   Thus, even under the accommodation's alternative notice process, members and their plans remain the central cog in Defendants' mechanism for delivering abortifacient services to employees and beneficiaries.

238.   Option 4, dropping health care benefits, would burden Alliance members' exercise of their Christian faith because:

    a.   Christian Values commend providing just compensation and benefits supportive of family values, including, whenever possible, health care;

b.　　　Eliminating health insurance for employees subjects members to annual excise taxes beginning in 2016 of $2,000 per employee after the first 30 employees; and

c.　　　Eliminating health insurance would put members at a significant disadvantage in the market for recruiting the best workers and thereby harm the operation of their ministries.

### 2.　　The Mandate's Substantial Burden on the Alliance's Religious Exercise

239.　　The Alliance's purpose, as stated in its articles of incorporation, is "[t]o support Christian employers . . . so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values." Ex. A., art. II.  The Alliance does this by providing a way for members to speak with one voice in opposition to the abortifacient Mandate and by providing education and counseling to members on the design and implementation of morally compliant health plans.

240.　　The Mandate burdens the Alliance's religious exercise by imposing burdens on its members and precluding the Alliance from providing them its full range of benefits.

241.　　The Mandate substantially burdens all members by requiring participation in an activity prohibited by their sincerely held Christian beliefs, preventing participation in conduct consistent with their sincerely held Christian beliefs, and placing substantial pressure on them to engage in conduct contrary to their sincerely held Christian beliefs. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (schools have standing to seek "protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property"; injunctions issue "to protect business enterprises against interference with the freedom of patrons or customers").

50

**D.   The Mandate Is Not a Generally Applicable Law, and Defendants Have No Compelling Interest in Enforcing It Against Plaintiffs.**

242.   The Mandate is not generally applicable.  It is riddled with exemptions that undermine the government's supposed purpose in imposing it.

243.   In imposing the Mandate, Defendants assert "compelling . . . interests" in "providing more women broad access to recommended preventive services, including contraceptive services, without cost sharing."  78 Fed. Reg. at 39,873.  Yet the Mandate, and the Affordable Care Act more broadly, leave tens of millions of women beyond the reach of this supposed interest.

244.   Organizations with grandfathered plans, covering tens of millions of workers, are exempt from the requirement to provide any form of CASC coverage.

245.   Small employers with fewer than 50 full-time employees are exempt from the requirement to provide a group health plan at all.  This leaves tens of millions of American workers without access to CASC coverage.

246.   As a result of these categorical exemptions, some secular and some religious, the Mandate is not generally applicable.

247.   Furthermore, Defendants do not have a compelling interest in enforcing the Mandate against the Alliance or its members.  The requirement to cover abortifacient services applies to some, but not nearly all, employers, and confers benefits on some, but not nearly all, employees.  The Mandate thus leaves appreciable damage to Defendants' supposedly vital interest unprohibited and unregulated.

248.   Also beyond the reach of the abortifacient coverage requirement are the employees of exempt "religious employers."  Defendants' stated reason for the exemption is that these organizations "are more likely than other employers to employ people of the same faith who share

51

the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39,874.  This is nothing more than indiscriminate guesswork by government regulators.

249.    Moreover, Defendants' reasoning does not explain why the Affordable Care Act exempts small employers and employers with grandfathered plans without regard to whether their employees are more or less likely to use abortifacient services.

250.    Defendants' supposed interest in enforcing the Mandate against Alliance members is further undermined by Defendants' concession that it *cannot* enforce the Mandate against TPAs that administer self-insured church plans for eligible organizations.  *See supra* ¶ 210.

251.    Defendants' concession is fatal to its assertion of a compelling interest.  It renders the Mandate's regulatory scheme incomplete and, for members with church plans, potentially worthless.  A member with a church plan could comply with the Mandate's requirements and deliver Form 700 to its TPA or notice to HHS.  In that situation, Defendants contend, they would be powerless to do anything.

252.    In other words, the Mandate forces some eligible organizations to fill out a form or provide a notice to HHS that, while violating the organizations' religious beliefs, may serve no governmental interest.  If the government has no power to enforce a law, it cannot have a compelling interest in enforcing that law.

E.    **The Mandate Is Not Neutral.**

253.    The Mandate is not neutral because the government discriminates between religious employers based on its classification system and because the government exempts other employers from the Mandate for wholly secular reasons.

254.    Statements of Defendant Secretary Burwell's predecessor, Secretary Sebelius, also show that the Mandate is not neutral.  Secretary Sebelius is an avowed advocate for abortion rights and a vocal critic of the Alliance's religious teachings and beliefs regarding the sanctity of life.  On October 5, 2011, Secretary Sebelius spoke at a NARAL Pro-Choice America fundraiser where she criticized individuals and organizations like Plaintiffs that object to abortifacient benefits on religious grounds.  She stated that "[w]e are in a war," referring to religious opponents of the Mandate.  She also stated, "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?  Not so much."

255.    In a speech on July 16, 2013, Secretary Sebelius compared opposition to the Mandate to opposition to civil rights legislation in the 1960s.  She accused opponents of the Mandate of spreading "fear and misinformation."  She applauded her listeners for supporting the Mandate just as they had supported "the fight against lynching."  *See* Kathleen Sebelius, Remarks at 104th NAACP Annual Conference (July 16, 2013), *available at* https://wayback.archive-it.org/3920/ 20150326111352/http://www.hhs.gov/secretary/about/speeches/sp20130716.html.

256.    Defendants evidenced their intent to foreclose all moral options available to eligible organizations by eliminating the Piggyback Option in the Final Rules, despite their contrary assurances in the ANPRM.

F.    **The Mandate Is Not the Least Restrictive Means of Furthering the Government's Interests.**

257.    The government has numerous means at its disposal for advancing its goal of expanding access to abortifacient services.

258.    The government could: (1) directly provide coverage of abortifacient benefits for individuals who do not currently receive such benefits through their health plans; (2) reimburse those who pay for abortifacient benefits through a combination of direct subsidies, tax deductions,

2010583440_8

and tax credits; (3) facilitate greater access to abortifacient benefits through the health insurance exchanges; or (4) work with other, willing organizations to expand access to abortifacient services.

259.    Each of these avenues would more directly advance the government's interest and simultaneously avoid the substantial burden on Alliance members religious practices imposed by the Mandate.  In particular, members would not be conscripted as conduits for delivery of abortifacient services to their employees, as they are under the Mandate.

## VII.    URGENT NEED FOR RELIEF

260.    For a particular employer, the 2015 Final Rules are effective on the date on or after September 14, 2015, that the employer's plan renews.  *See* 80 Fed. Reg. at 41,318.  On that date, the employer must be in compliance with the Mandate or face severe penalties.

261.    Several Alliance members' plans renew on various dates throughout 2016.

262.    At least one Alliance member is a for-profit entity whose health plan does not provide coverage for abortifacient services, who has not entered into the accommodation, and whose health plan renews on September 1, 2016.  To date, this member was protected from the Mandate pending issuance of the 2015 Final Rules.  Because the 2015 Final Rules will become effective against this member on September 1, 2016, the need for relief is urgent.  Absent a temporary restraining order or preliminary or permanent injunction, this member will begin accrue crippling fines for its failure to comply with the Mandate on September 1, 2016.

## VIII.    CAUSES OF ACTION

### FIRST CLAIM
### Violation of RFRA, 42 U.S.C. § 2000bb-1

263.    All preceding paragraphs are incorporated by reference.

264.    Alliance members' sincerely held religious beliefs prohibit them from in any way paying for, providing, or facilitating access to abortifacient benefits, including by maintaining a group health plan that covers or otherwise provides access to these services.

265.    Alliance members' sincerely held religious beliefs equally prohibit them from contracting or arranging for provision of abortifacient services through a surrogate, such as an insurer or TPA.

266.    Alliance members' compliance with these sincerely held religious beliefs constitutes the exercise of religion, and such exercise is protected by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1.

267.    The Mandate requires Alliance members to provide, pay for, or directly or indirectly facilitate access to or to contract or arrange for provision of abortifacient services for their employees in violation of their sincerely held religious beliefs.

268.    By threatening Alliance members with ruinous fines and other penalties for failure to comply, the Mandate puts substantial pressure on members to abandon their religious beliefs or engage in conduct that violates their religious beliefs.

269.    The Mandate exposes Alliance members to significant competitive disadvantages.

270.    The Mandate substantially burdens Alliance members' exercise of religion.

271.    Defendants have no compelling interest in applying the Mandate to Alliance members.

272.    Applying the Mandate to Alliance members is not the least restrictive means of furthering Defendants' interests.

273.     By enacting the Mandate and threatening to enforce it against Alliance members, Defendants have violated RFRA.

## SECOND CLAIM

### Violation of the Establishment Clause,
### Government Discrimination Among Religious Individuals and Religious Groups

274.     All preceding paragraphs are incorporated by reference.

275.     The Establishment Clause of the First Amendment to the United States Constitution requires government neutrality toward religion and prohibits the government from discriminating among religions and preferring some religious views over others.

276.     The Establishment Clause also forbids discrimination among religious institutions based on the source of the institution's financial support or on the religious composition of the organization's employees.

277.     Through its elaborate religious classifications, the Affordable Care Act and the Mandate discriminate among religious persons and organizations.

278.     The Affordable Care Act and the Mandate impose selective burdens on certain religious adherents and certain religious institutions.

279.     The Mandate's narrow exemption for "religious employers" discriminates among religious organizations on the basis of religious views, religious status, or institutional structure or affiliation by determining that some organizations are "religious enough" to qualify for a full exemption while others are not.

280.     The Mandate's exemption of integrated auxiliaries of churches, coupled with the government's refusal to exempt separately incorporated ministries, is irrational and discriminatory.

2010583440_8

281.    The Mandate adopts a particular theological view of what is acceptable moral complicity in an organization's provision of abortifacient services, favoring some organizations with full exemption and requiring others to enter into the morally unacceptable accommodation.

282.    The Mandate reflects Defendants' judgment about the importance or centrality of religious mission, favoring the purpose and mission of "religious employers" over the purpose and mission of eligible organizations.

283.    The Affordable Care Act and the Mandate violate the Establishment Clause.

### THIRD CLAIM

### Violation of the Free Exercise Clause, Substantial Burden

284.    All preceding paragraphs are incorporated by reference.

285.    Alliance members' sincerely held religious beliefs prohibit them from in any way paying for, providing, or directly or indirectly facilitating access to abortifacient benefits, including by maintaining a group health plan that covers or otherwise provides access to these services.

286.    Alliance members' sincerely held religious beliefs equally prohibit them from contracting or arranging for provision of abortifacient services by another.

287.    Alliance members' compliance with these sincerely held religious beliefs constitutes the exercise of religion.  Such exercise is protected by the First Amendment Free Exercise Clause.

288.    The Mandate is not a law of general applicability.

289.    The Mandate is subject to categorical exemptions that undermine Defendants' stated interests in the law.

290.    The Mandate is not neutral.

2010583440_8

291.    The Mandate was promulgated for the purpose of discriminating against Alliance members' sincerely held religious beliefs regarding abortion, abortifacients, and related counseling.

292.    The Mandate substantially burdens Alliance members' exercise of religion.

293.    The Mandate does not further a compelling governmental interest.

294.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

295.    By enacting and threatening to enforce the Mandate against Alliance members, Defendants have violated the Free Exercise Clause.

## FOURTH CLAIM

### Violation of the Free Exercise Clause, Intentional Discrimination

296.    All preceding paragraphs are incorporated by reference.

297.    In promulgating the Mandate and refusing to exempt all but a narrow subset of religious organizations, Defendants deliberately targeted religious organizations like Alliance members for discriminatory treatment.

298.    In eliminating the Piggyback Option in the Final Rules, Defendants deliberately targeted religious organizations like Alliance members for discriminatory treatment and sought to suppress their religious exercise.

299.    By enacting and threatening to enforce the Mandate against Alliance members, Defendants have violated the Free Exercise Clause.

## FIFTH CLAIM

### Violation of the Free Exercise and Establishment Clauses, Interference in Matters of Internal Religious Governance

300.    All preceding paragraphs are incorporated by reference.

2010583440_8

301.    The Free Exercise Clause and the Establishment Clause protect the freedom of religious organizations to decide for themselves, free from government interference, matters of internal governance as well as those of faith and doctrine.

302.    Under these Clauses, the government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, leadership, or doctrine.

303.    Under these Clauses, the government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

304.    Each member of the Alliance has made an internal decision, dictated by its Christian faith, that the health plans it makes available to its employees should not provide, pay for, or directly or indirectly facilitate access to abortifacient services.

305.    The Mandate interferes with these members' internal decisions concerning their structure and mission by requiring them to provide, pay for, or directly or indirectly facilitate practices that directly conflict with their Christian beliefs.

306.    The Mandate creates the risk of scandal by requiring members to provide, pay for, or directly or indirectly facilitate practices that directly conflict with their Christian beliefs.

307.    The Mandate artificially divides Christian ministries into those that are exempt (such as churches) and those that are not (such as parachurch ministries).  In so doing, the Mandate inhibits the Evangelical Christian ministries' ability to speak with one voice on issues regarding the sanctity of life.

2010583440_8

308.    The Mandate thus interferes with the faith and mission of Christian churches and parachurch ministries.

309.    Because the Mandate intrudes on matters of internal religious governance and interferes with the faith and mission of Christian churches and parachurch ministries, it violates the Establishment Clause and Free Exercise Clause.

## SIXTH CLAIM

### Violation of the Free Speech Clause

310.    All preceding paragraphs are incorporated by reference.

311.    The Free Speech Clause of the First Amendment to the United States Constitution prohibits the government from compelling a speaker to convey a message that the speaker finds morally repugnant.

312.    The Free Speech Clause also prohibits the government from regulating speech based on the content of the message, the viewpoint expressed in the message, the motivation for the message, or the identity of the speaker.

313.    By requiring a self-insured member employer to notify its TPA of the TPA's obligations to provide or arrange for separate payment of abortifacient services, the Mandate compels such members to convey a message they find morally repugnant.

314.    The speech compelled by the Mandate is not commercial speech.

315.    Defendants have no compelling interest in enlisting self-insured members as government mouthpieces concerning abortifacient services.

316.    The Mandate's compulsion of speech is not necessary to further any interest of Defendants.

317.    The Mandate's compulsion of speech is substantially underinclusive.

60

318.     The Mandate's compulsion of speech violates self-insured members' rights under the Free Speech Clause.

## SEVENTH CLAIM

### Violation of the Free Speech and Free Exercise Clauses, Unbridled Discretion

319.     All preceding paragraphs are incorporated by reference.

320.     By purporting to give HHS, through HRSA, "discretion to exempt certain religious employers from the Guidelines," the Mandate vests HHS with unbridled discretion over which organizations will have their First Amendment rights protected.

321.     Defendants have exercised unbridled discretion in a discriminatory manner by granting an exemption via a footnote on HRSA's website for "religious employers" but not for other organizations with identical religious objections to the Mandate, like the eligible organizations who are Alliance members.

322.     Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Mandate, despite its conflict with the free exercise of religion.

323.     Defendants' actions violate the Alliance members' right not to be subjected to a system of unbridled discretion when engaging in speech or religious exercise, as secured to them by the First Amendment to the United States Constitution.

## EIGHTH CLAIM

### Violation of the Administrative Procedure Act, Lack of Good Cause and Improper Delegation

324.     All preceding paragraphs are incorporated by reference.

2010583440_8

325.   The Affordable Care Act expressly delegates to HHS, through HRSA, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

326.   In light of this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the Guidelines. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

327.   Defendants promulgated the Guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

328.   Defendants, instead, wholly delegated their responsibility for issuing the Guidelines to a nongovernmental entity, the IOM.

329.   The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the Guidelines.

330.   Within two weeks of the IOM's issuing its recommendations, HHS issued the Guidelines.  HHS admitted that the Guidelines were "developed" by IOM.

331.   HHS abdicated its responsibility to administer, interpret, and faithfully execute the Affordable Care Act by adopting the IOM's recommendations wholesale, without further notice-and-comment rulemaking and without consideration of numerous relevant factors that IOM explicitly declined to consider.

332.   Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

62

333.     Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the Guidelines by completing a meaningful "consideration of the relevant matter presented."

334.     Thereafter, Defendants did not consider or respond to the voluminous subsequent comments they received in opposition to the Interim Final Rules or the NPRM.

335.     Therefore, Defendants have taken agency action not in observance with procedures required by law, and Defendants' actions should be set aside pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

### NINTH CLAIM

### Violation of the Administrative Procedure Act, Arbitrary and Capricious Action

336.     All preceding paragraphs are incorporated by reference.

337.     In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of enforcing the Mandate against Alliance members and similar organizations.

338.     The Mandate arbitrarily distinguishes between exempt "religious employers" and accommodated "eligible organizations," between churches and separately incorporated parachurch ministries.

339.     Defendants' explanation for their decision not to exempt eligible organizations from the Mandate runs counter to the evidence submitted by religious organizations during the comment periods.

340.     Former Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially conceded that the Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.

2010583440_8

341.    Defendants' issuance of the Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because Defendants failed to consider the full implications of the Mandate and they did not take into consideration the evidence against it.

## TENTH CLAIM

### Violation of the Administrative Procedure Act,
### Agency Action Not in Accordance With the Law

342.    All preceding paragraphs are incorporated by reference.

343.    The Weldon Amendment prohibits Defendants HHS and the Department of Labor from discriminating against a group health plan, including those maintained by Alliance members, on the basis that the plan fails to provide, pay for, provide coverage of, or refer for abortions.

344.    Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title" (including the provision requiring plans to cover women's "preventive care" services) "shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."  42 U.S.C. § 18023(b)(1)(A)(i).

345.    Some of the drugs approved as "contraceptives" by the FDA and thus required to be covered by the Mandate are drugs known to cause medical abortions.

346.    The Mandate violates the Weldon Amendment because it discriminates against Alliance members by requiring their group health plans to provide, pay for, or facilitate access to abortifacient services.

347.    The Mandate violates Section 1303(b)(1)(A) of the Affordable Care Act by requiring Alliance members' group health plans to provide coverage of abortifacient services.

348.    As set forth above, the Mandate violates RFRA and the First Amendment.

349.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law and in violation of the Administrative Procedure Act.

## **PRAYER FOR RELIEF**

Wherefore Plaintiffs request that the Court:

a.      Declare that the abortifacient Mandate and Defendants' enforcement of the abortifacient Mandate against the Alliance and its members violate the Religious Freedom Restoration Act, and that no taxes, penalties, or other burdens can be charged or assessed against the Alliance or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortifacient services, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

b.      Declare that the abortifacient Mandate and Defendants' enforcement of the abortifacient Mandate against the Alliance and its members violate the First Amendment to the United States Constitution, and that no taxes, penalties, or other burdens can be charged or assessed against the Alliance or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortifacient services, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

c.      Declare that the abortifacient Mandate was issued in violation of the Administrative Procedure Act, and that no taxes, penalties, or other burdens can be charged or assessed against the Alliance or its members for failure to pay for, provide, or directly or indirectly facilitate access to abortifacient services, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

d.      Declare that Defendants may not apply or enforce the abortifacient Mandate against the insurers and TPAs of Alliance members; may not interfere with members' attempts to

65

arrange or contract for morally compliant health coverage or related services for their employees; and that no taxes, penalties, or other burdens can be charged or assessed against such insurers or TPAs in relation to their work for Alliance members;

e.    Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from enforcing the abortifacient Mandate against the Alliance and its present and future members; prohibiting Defendants from charging or assessing taxes, penalties, or other burdens against the Alliance and its present and future members for failure to pay for, provide, or directly or indirectly facilitate access to abortifacient services; prohibiting Defendants from applying or enforcing the abortifacient Mandate against the insurers and TPAs of the Alliance's present and future members; and prohibiting Defendants from interfering with the Alliance's present and future members' relationships with their insurers or TPAs and with those members' attempts to contract for morally compliant health coverage for their employees;

f.    Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 42 U.S.C. § 1988(b); and

g.    Award such other and further relief as the Court deems equitable and just.

<center>&lt;Signature page follows&gt;</center>

DATED: August 26, 2016.

Respectfully submitted,

L. Martin Nussbaum
Eric Kniffin
Ian Speir
Lewis Roca Rothgerber Christie LLP
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO  80903
719-386-3000; f: 719-386-3070
mnussbaum@lrrc.com
ekniffin@lrrc.com
ispeir@lrrc.com
*Pro Hac Vice Motions Pending*

Attorneys for Plaintiffs

sdg

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

*(for Christian Employers Alliance)*

I declare under penalty of perjury that the foregoing allegations pertaining to the Christian Employers Alliance, including its identity, beliefs, and practices, are true and correct to the best of my knowledge.

I further declare under penalty of perjury that Exhibit A attached hereto is a true and accurate copy of the Articles of Incorporation of the Christian Employers Alliance, and Exhibit B is a true and accurate copy of the First Amended & Restated Bylaws of the Christian Employers Alliance.

Executed on ___8 - 26 - 16___.

_____
Jim Mischel
Chairman of the Board, Christian Employers Alliance

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

*(for Trinity Bible College and Graduate School)*

I declare under penalty of perjury that the foregoing allegations pertaining to Trinity Bible College and Graduate School are true and correct to the best of my knowledge.

Executed on ___August 26, 2016___

Dr. Paul Alexander
President, Trinity Bible College and Graduate School

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

*(for Treasure Island Coins, Inc.)*

I declare under penalty of perjury that the foregoing allegations pertaining to Treasure Island Coins, Inc. are true and correct to the best of my knowledge.

Executed on *August 26th, 2016*.

Christopher Olson
President/CEO, Treasure Island Coins, Inc.